UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

RICHARD SUYDAM,                    )
                                  )
          Plaintiff,              )
                                  )
     v.                           )        2:11-cv-00055-JAW
                                  )
UNITED STATES BUREAU OF           )
ALCOHOL, TOBACCO, FIREARMS        )
AND EXPLOSIVES,                   )
                                  )
          Defendant.              )

**ORDER ON MOTION FOR SUMMARY JUDGMENT**

The Bureau of Alcohol, Tobacco, Firearms & Explosives (ATF) seeks summary judgment against Richard Suydam, a federally licensed firearms dealer, upholding its revocation of Mr. Suydam's license for his willful violation of the record-keeping requirements of federal firearms regulations. The Court concludes that the ATF's revocation was authorized and summary judgment for the ATF is appropriate.

I.      **PROCEDURAL AND FACTUAL BACKGROUND**

A.      **Procedural History**

On February 11, 2011, Richard Suydam filed a complaint seeking *de novo* judicial review, pursuant to 18 U.S.C. § 923(f)(3), of the ATF's revocation of his federal firearms license. *Compl.* (Docket # 1). The ATF answered on May 4, 2011. *Answer* (Docket # 7).

On June 17, 2011, the ATF moved for summary judgment and filed a statement of material facts. *Def.'s Mot. for Summ. J.* (Docket # 9) (*Def.'s Mot,*);

*Def.'s Statement of Undisputed Material Facts in Support of Def.'s Mot. for Summ. J.* (Docket # 10) (DSMF).  Mr. Suydam filed his opposition on June 30, 2011, along with a response to the ATF's statement of facts and a set of additional facts.  *Pl.'s Mem. of Law in Opp'n to Def.'s Mot. for Summ. J.* (Docket # 14) (*Pl.'s Opp'n*); *Pl.'s Opposing Statement of Material Facts* (Docket # 15) (PRDSMF, PSAMF).  The ATF filed its response to Mr. Suydam's opposition and a reply statement of facts on July 14, 2011.  *Def.'s Reply Mem. in Support of Mot. for Summ. J.* (Docket # 17) (*Def.'s Reply*); *Def.'s Reply Statement of Material Facts* (Docket # 18) (DRPSAMF).

Upon Mr. Suydam's motion, the Court held oral argument on the ATF's motion for summary judgment on February 17, 2012.

## B.  Statement of Facts[1]

### 1.  Background

Richard E. Suydam has held ATF Importer's Federal Firearms License (FFL) No. 6-01-017-08-3D-33134 since 1987.  DSMF ¶¶ 1, 3; PRDSMF ¶¶ 1, 3.  The Veterans Administration has determined Mr. Suydam to be 70% disabled and the Social Security Administration has determined him 100% disabled.  PSAMF ¶ 12; DRPSAMF ¶ 12.  He is an insulin-dependent diabetic; prolonged physical exertion can cause a rapid decrease in blood sugar, resulting in a diabetic coma, which has happened to Mr. Suydam on several occasions.  PSAMF ¶ 13; DRPSAMF ¶ 13.  Mr. Suydam also suffers from military service-related back and knee injuries, making it difficult to walk up and down stairs, to bend over, to lift objects, or to get down on

---

[1] In accordance with "conventional summary judgment praxis," the Court recounts the facts in the light most favorable to Mr. Suydam's theory of the case, consistent with record support.  *Gillen v. Fallon Ambulance Serv., Inc.*, 283 F.3d 11, 17 (1st Cir. 2002).

his knees, and he suffers from severe chronic back spasms.  PSAMF ¶ 14; DRPSAMF ¶ 14.  He has a chronic left shoulder impingement problem that limits his ability to reach for and pick up things.  PSAMF ¶ 15; DRPSAMF ¶ 15.  Mr. Suydam also has a blood pressure problem, which periodically causes him to pass out.  PSAMF ¶ 16; DRPSAMF ¶ 16.  He has arthritis in his spine and feet, which makes it difficult for him to walk, bend over, and lift objects.  PSAMF ¶ 17; DRPSAMF ¶ 17.  Mr. Suydam also suffers from two mental conditions, attention deficit and hyperactivity disorder and obsessive compulsive disorder, that make it extremely difficult for him to focus and stay on task.  PSAMF ¶ 18; DRPSAMF ¶ 18.

### 2.      The 2008 Inspection and Warnings

On September 9, 2008, Industry Operations Investigator (IOI) Adrienne Brown inspected Mr. Suydam's business for compliance with the requirements of the Gun Control Act (GCA) and related federal firearms regulations.  DSMF ¶ 4; PRDSMF ¶ 4.  During the inspection, IOI Brown asked to review Mr. Suydam's Acquisition and Disposition Records (A&D Book).  DSMF ¶ 6; PRDSMF ¶ 6.  Mr. Suydam produced an A&D Book for the period from 2002 to the date of the inspection but was unable to produce an A&D Book for the period from 1989 to 2002.  DSMF ¶¶ 7-8; PRDSMF ¶¶ 7-8.

During the inspection, IOI Brown reviewed with Mr. Suydam the GCA's federal firearms regulations with which Mr. Suydam was required to comply.  DSMF ¶ 9; PRDSMF ¶ 9.  This review included the requirement that all federal firearms licensees maintain an A&D Book, pursuant to 27 C.F.R. § 478.125(e), and

maintain their records for no less than twenty years, pursuant to 27 C.F.R. § 478.129.  DSMF ¶¶ 11-12; PRDSMF ¶¶ 11-12.  During this review, IOI Brown completed and Mr. Suydam signed an Acknowledgement of Federal Firearms Regulations checklist, listing each regulation IOI Brown and Mr. Suydam had reviewed.  DSMF ¶ 10; PRDSMF ¶ 10.

Following the September 9, 2008 inspection, IOI Brown completed a Report of Violations (ROV), setting forth the violations of the federal firearms regulations she said she discovered by her inspection.[2]  DSMF ¶ 13; PRDSMF ¶ 13.  The ATF cited

---

[2] ATF's statement of material fact paragraph 13 states:

> Following the September 9, 2008 inspection and review of regulations, IOI Brown completed a Report of Violation (ROV) for Suydam, setting forth his violations of the Federal Firearms Regulations, as discovered during the September 9, 2008 inspection.

DSMF ¶ 13.  In support of this statement, ATF cites Exhibit C to Exhibit B of S. Roy Chabra's declaration.  DSMF ¶ 13, Attach. 1, *Decl. of S. Roy Chabra*, Ex. B (Docket # 10), Attach. 3, Ex. B, *Tr. of Oct. 6, 2010 Hr'g* 21, Ex. C., *Report of Violations* (Sept. 22, 2008).  The attached exhibit is entitled "Report of Violations" and sets forth two violations arising from the September 4, 9, and 22, 2008 inspections.  *Id.*  The Report of Violations has what appears to be Mr. Suydam's signature.

Mr. Suydam interposed a qualified objection to paragraph 13:

> The ROV set forth the alleged violations.  For the reasons stated in response to alleged fact # 7, the Plaintiff does not agree that his failure to have his old A&D book, for guns acquired prior to 2002, was a violation of the regulations.

PRDSMF ¶ 13.  For support, Mr. Suydam cites paragraph 8 of his affidavit, which reads:

> Because I did not have my A&D Book for guns I had acquired prior to 2002 for reasons that were totally beyond my control, I do not believe that I was in violation of the ATF regulations for failing to be able to produce that book on September 9, 2008.

*Id.* Attach. 1, *Aff. of Richard Suydam* ¶ 8 (Docket # 15).  The "reasons stated in response to alleged fact # 7" are:

> The Plaintiff told the Defendant several times prior to 9/9/08 that his former girlfriend had his A&D Book, and was refusing to return it to him.  The Defendant told him to start a new book.  The Plaintiff also asked the Defendant several times prior to 9/9/08 to help him retrieve the book from her, but the Defendant's agents told him that they would only get the book from her if he first gave up his Importer's license.  He told the Defendant that he was not willing to give up his license; so the Defendant was well aware on 9/9/08 that he did not have his A&D Book for the period from 1998 to 2002.

PRDSMF ¶ 7.  Although the Court notes Mr. Suydam's qualified response and has altered the ATF statement to reflect that these are violations the ATF asserted, whether Mr. Suydam actually violated ATF regulations in 2008 is not before the Court.  ATF points to the 2008 inspection and the

Mr. Suydam for two violations: 1) failure to record the acquisition of a firearm not later than 15 days after the date of importation or other acquisition, and 2) failure to retain an A&D Book from 1989 to 2002 for the disposition of firearms to federal firearms licensees. DSMF ¶¶ 14-15; PRDSMF ¶¶ 14-15. On September 22, 2008, IOI Brown returned and provided the ROV to Mr. Suydam; the two reviewed the violations and discussed the steps Mr. Suydam should take to ensure Mr. Suydam's future compliance. DSMF ¶ 16; PRDSMF ¶ 16. During this meeting, both IOI Brown and Mr. Suydam signed the ROV. DSMF ¶ 17; PRDSMF ¶ 17.

On February 5, 2009, IOI Brown and Chris S. Turett, Area Supervisor, Boston Area Office, ATF, held a warning conference with Mr. Suydam. DSMF ¶ 18; PRDSMF ¶ 18. Supervisor Turett and IOI Brown discussed with Mr. Suydam his violations, as set forth in the ROV, and the importance of complying with federal firearms regulations, especially the importance of maintaining an A&D Book and having it available for review by the ATF. DSMF ¶ 19; PRDSMF ¶ 19. At the conference, Mr. Suydam stated that he understood the regulations requiring proper maintenance of an A&D Book and the importance of compliance with these regulations. DSMF ¶ 20; PRDSMF ¶ 20. The next day, on February 6, 2009, Supervisor Turett sent a follow-up letter to Mr. Suydam via certified mail, which Mr. Suydam received and signed for. DSMF ¶ 21; PRDSMF ¶ 21. The letter set forth the ATF's understanding of the discussions at the warning conference. DSMF

---

ROV to support its contention that Mr. Suydam was aware of the ATF record-keeping regulations and the importance of compliance. Mr. Suydam admits that he reviewed the September 22, 2008 violations with ATF agents and received multiple explanations and warnings after the 2008 inspection. PRDSMF ¶¶ 9-12, 16-19, 21, 23-24.

¶ 22; PRDSMF ¶ 22. The letter also reminded Mr. Suydam that "future violations, repeat or otherwise, could be viewed as willful and may result in the revocation of [his] license" and that he could "anticipate further inspections to ensure [his] compliance." DSMF ¶¶ 23-24; PRDSMF ¶¶ 23-24.

### 3. The A&D Book Variance

On July 12, 2009, Mr. Suydam requested a variance from the ATF concerning the keeping of an A&D Book.[3] DSMF ¶ 25; PRDSMF ¶ 25. The ATF granted the requested variance on September 14, 2009, allowing Mr. Suydam to combine his acquisition and distribution records into one A&D Book, but the ATF listed certain conditions, including reiterating the requirement that the A&D Book be maintained separate from other records and be made available to the ATF upon request. DSMF ¶ 27; PRDSMF ¶ 27. Mr. Suydam states that he was unsure whether the variance was granted and so continued to maintain two separate A&D Books, one for importation and one for curios and relics. PRDSMF ¶ 27. While the variance request was one commonly sought from federal firearms licensees and commonly granted by the ATF, it did not allow for any other deviations from federal firearms regulations. DSMF ¶¶ 28-29; PRDSMF ¶¶ 28-29.

---

[3] The parties disagree as to the exact variance requested; the ATF says he requested a variance to combine three separate A&D Books into one, DSMF ¶ 26; Mr. Suydam says he requested a variance to combine two separate books, one for "Imported for Resale" guns and one for "his own, personal not-for-resale 'Curios and Relics.'" PRDSMF ¶ 26. The exact contours of the variance are immaterial, because both parties agree that the variance did not allow Mr. Suydam to fail to keep A&D Books altogether and did not excuse him from presenting those records to the ATF for inspection. DSMF ¶¶ 27-29; PRDSMF ¶¶ 27-29.

### 4. The 2002-2009 A&D Book Goes Missing

In mid to late November of 2009, Mr. Suydam realized his A&D Book was missing. PSAMF ¶ 1; DRPSAMF ¶ 1. Mr. Suydam assumed workers had inadvertently moved the book into his second floor storage room (without Mr. Suydam's knowledge or permission) when they were moving some other books in his home. PSAMF ¶ 2; DRPSAMF ¶ 2.

The second floor storage room is approximately 12 feet long and 9 feet wide. PSAMF ¶ 3; DRPSAMF ¶ 3. The room held at least 5,000 books at the time the 2002 A&D Book went missing.[4] PSAMF ¶ 4; DRPSAMF ¶ 4. These books were stacked chest high, with one "huge" stack about seven feet long and five feet wide in the middle of the room, and numerous stacks a few feet long and about 2 feet wide all around the perimeter of the room; there was not enough space for Mr. Suydam to walk between the stacks of books. PSAMF ¶ 5; DRPSAMF ¶ 5. While moving books from the first floor of Mr. Suydam's home to the second floor storage room, the workers rearranged and restacked the books in the room; Mr. Suydam knew that if the workers had moved the A&D Book into that room it could be anywhere, including in the middle of one of the stacks. PSAMF ¶ 6; DRPSAMF ¶ 6.

---

[4] In his statement of additional facts, Mr. Suydam asserts that the room held over 5,000 books, to which the ATF objects. PSAMF ¶ 4; DRPSAMF ¶ 4. During his sworn testimony at the revocation hearing, Mr. Suydam testified that the room held "a 4,000-book collection." DSMF Attach. 1 *Chabra Decl.* Ex. B (*Revocation Tr.*) at 61. Even though Mr. Suydam appears to have contradicted himself on the exact number of books, the Court accepts his current version. Even so, the exact number is not material. The point is that there was a very large collection of books in the small storage room.

Mr. Suydam asserts that upon realizing the book was missing, he notified the ATF and an agent told him to start a new book until he found the missing one.[5] PRDSMF ¶ 33; PSAMF ¶ 1; DRPSAMF ¶ 1. Despite the agent's advice, Mr. Suydam remained very concerned and knew he had to find the book as soon as possible. PSAMF ¶ 1; DRPSAMF ¶ 1.

After realizing the book was missing, Mr. Suydam scanned the stacks of books in the storage room, making a visual search for the red A&D Book, but he did not see the book. PSAMF ¶¶ 7-9; DRPSAMF ¶¶ 7-9. Mr. Suydam assumed that book was in the middle of one of the stacks of books or otherwise obstructed from view. PSAMF ¶ 9; DRPSAMF ¶ 9.

Because of his physical limitations and numerous medical conditions, Mr. Suydam believed that he could not conduct an extensive search for the missing A&D Book himself.[6] PSAMF ¶ 19; DRPSAMF ¶ 19. Because of his blood pressure condition, he did not want to risk passing out in the storage room.[7] PSAMF ¶ 16; DRPSAMF ¶ 16. Mr. Suydam lived alone and did not have anyone readily available to help him with things around the house. PSAMF ¶ 20; DRPSAMF ¶ 20. The

[5] The ATF qualifies its response to this statement, noting that Mr. Suydam is unable to identify the agent who told him to start a new book and that his estoppel claim is inconsistent. DRPSAMF ¶ 1. The Court accepts Mr. Suydam's version for purposes of this motion.

[6] The ATF objects to the statement that Mr. Suydam was unable to make an extensive search for the missing book on his own on two grounds: first, that no admissible evidence nor expert testimony has been admitted supporting Mr. Suydam's claim, and second, that Mr. Suydam testified to the contrary at the administrative hearing. DRPSAMF ¶ 11. Specifically, the ATF points out that Mr. Suydam testified that searching for the book himself would be "not pleasant" but not impossible. DRPSAMF ¶ 11 (citing *Revocation Tr.* at 55). The Court accepts Mr. Suydam's version.

[7] The ATF qualifies its response to this statement, claiming that Mr. Suydam's fears of passing out and dying in the storage room were unfounded and that, in fact, the storage room was one of the safer rooms in his house because it had a telephone Mr. Suydam could use to call for help in the event of an emergency. DRPSAMF ¶ 16. The Court accepts Mr. Suydam's version for purposes of this motion.

workers Mr. Suydam had hired to move his books into the second floor storage room had moved out of state and were not around to assist him in searching for the book. PSAMF ¶ 21; DRPSAMF ¶ 21. Mr. Suydam knew very few people in the area where he lived and the people he knew were either unavailable to spend days or weeks looking for the book or were not people he trusted to have in his home.[8] PSAMF ¶ 22; DRPSAMF ¶ 22. Mr. Suydam did not get out of his house often during the winter of 2009 and was not able to look in earnest for someone to hire to search for the misplaced A&D Book until the spring. PSAMF ¶ 23; DRPSAMF ¶ 23.

Mr. Suydam asserts that he was not indifferent to finding the book between the time it went missing in late November of 2009 and the March 3, 2010 inspection,[9] but rather was "very concerned" and "tried his best to find the book." PSAMF ¶¶ 24-25; DRPSAMF ¶¶ 24-25. During this time, he was "physically and

---

[8] The ATF objects to paragraph 22 of Mr. Suydam's statement of additional facts, arguing that it contradicts Mr. Suydam's testimony at the revocation hearing and citing *Thore v. Howe*, 466 F.3d 173, 186 n.7 (1st Cir. 2006), for the proposition that a party may not defeat summary judgment by filing an affidavit that contradicts previous clear and unambiguous testimony. DRPSAMF ¶ 22. Mr. Suydam testified at the revocation hearing that he had at least one "very good friend" in the area, "Father Beegan," who had a key to his house and with whom he went shopping. *Revocation Tr.* at 63:2-15.

The testimony and the affidavit are not flatly contradictory. First, as to his assertion that he knew very few people in the area, there is no contradiction at all. Second, as to his friendship with Father Beegan, there is no evidence that Father Beegan would have been available to spend days or weeks looking for the book. *Compare Revocation Tr.* at 63:2-15 *with* PSAMF ¶ 22. The Court overrules the ATF's objection to paragraph 22.

The ATF also objects to Mr. Suydam's statement that none of his friends was available to "spend several days or weeks looking for the book," on the grounds that when someone finally began to look for the book in August of 2010 it was found, by Mr. Suydam's admission, after only one day of searching. DRPSAMF ¶ 22; DSMF ¶ 46; PRDSMF ¶ 46. Because, prior to finding the book, no one could have known how long the search would take, the Court adopts Mr. Suydam's version for purposes of this motion.

[9] The ATF denies this statement, arguing that Mr. Suydam's indifference to his record-keeping requirements is a legal conclusion and "not proper for a statement of facts." DRPSAMF ¶ 24. The Court disagrees and it includes the statement as a fact, not a legal conclusion.

medically unable to conduct an extensive search for the book himself" and was "unable to find anyone else available or that he trusted" to search for it prior to March 3, 2010.[10]  PSAMF ¶ 26; DRPSAMF ¶ 26.

### 5.    The 2010 Inspection and Violations

On March 3, 2010, ATF agents IOI Matthew Gagne and IOI Nicholas O'Leary conducted an inspection of Mr. Suydam's premises.  DSMF ¶ 30; PRDSMF ¶ 30. During this inspection, IOI Gagne requested to review Mr. Suydam's A&D Book. DSMF ¶ 31; PRDSMF ¶ 31.  IOI Gagne had read IOI Brown's report and knew Mr. Suydam would not have his A&D Book for the period before 2002.  DSMF ¶¶ 32-33; PRDSMF ¶¶ 32-33.[11]

At the inspection, Mr. Suydam produced an A&D Book for the period from November 30, 2009 to March 3, 2010, the date of inspection.  DSMF ¶ 34; PRDSMF ¶ 34.  The first page of the A&D Book stated "This Ledger import/dealer '08, was opened on November 30th, 2009 as of 13:00 as a replacement of the original lost/misplaced item."  DSMF ¶ 35; PRDSMF ¶ 35.  IOI Gagne asked Mr. Suydam to

---

[10] The ATF objects to this statement, claiming that Mr. Suydam's medical or physical abilities constitute an impermissible expert conclusion by a lay witness and that he provides no foundation for the conclusion that he was medically unable to search for the book himself.  DRPSAMF ¶ 26.  The objection is overruled.

The ATF also objects to Mr. Suydam's statement that he was unable to find anyone he trusted to search for the book, claiming it contradicts his testimony at the license revocation hearing, again citing *Thore v. Howe*, 466 F.3d at 186 n.7.  DRPSAMF ¶ 26.  For the reasons stated in footnote 8, *supra*, the Court overrules this objection and adopts Mr. Suydam's version.

[11] The ATF says that IOI Gagne expected Mr. Suydam to produce a complete A&D Book from 2002 particularly given the 2008 and 2009 warnings regarding his A&D Book obligations.  DSMF ¶ 33. However, Mr. Suydam denied this statement, noting that he had contacted the ATF, had told an agent about the lost book, and had been told to begin a new one until he found the missing book. PRDSMF ¶ 33.  Mr. Suydam's denial is questionable because it assumes that IOI Gagne knew or should have known about his conversation with another agent.  Nevertheless, under the summary judgment praxis, the Court accepts Mr. Suydam's version.

provide his A&D Book for the period before November 30, 2009, at which point Mr. Suydam admitted that he had lost the book at some point before November 30, 2009 and was unable to produce it. DSMF ¶¶ 36-37; PRDSMF ¶¶ 36-37. Mr. Suydam told the ATF investigators that he had hired some individuals to move various books from the first floor of his home to a room on the second floor and that, because he usually kept the A&D Book on the first floor, he assumed his A&D Book had likely been moved along with the other books to that second floor storage room. DSMF ¶¶ 38-39; PRDSMF ¶¶ 38-39. Mr. Suydam admitted to the ATF investigators that after the movers left, he had been unable to find his A&D Book and had concluded that it had likely been moved with the rest of his books, even though he had not intended for that to occur. DSMF ¶ 40; PRDSMF ¶ 40.

IOI Gagne asked Mr. Suydam if he had searched for the lost A&D Book. DSMF ¶ 42; PRDSMF ¶ 42. Despite believing that the book was likely in his second floor storage room, Mr. Suydam admitted that he had only made a "cursory search" but it was not in plain sight so he was unable to find it.[12] DSMF ¶ 41; PRDSMF ¶ 41. Mr. Suydam told the investigators that finding the book in the storage room would take a great deal of time and physical effort, and that he was "physically and medically unable" to make an extensive search for the book himself.[13] PRDSMF ¶

---

[12] The parties present slightly different descriptions of Mr. Suydam's search for the 2002-2009 A&D Book. While the ATF posits that Mr. Suydam "declined to mount an extensive search for the book," DSMF ¶ 41, Mr. Suydam denies this fact, instead asserting that he told the investigators that he had made a "cursory search for the book in the second floor storage room, but it was not in plain sight . . . so he was unable to find it," PRDSMF ¶ 41. The Court does not view these statements as inconsistent; a "cursory search" is, by definition, something less than an "extensive" one. However, it accepts Mr. Suydam's adjective for purposes of the motion.

[13] The ATF objects to the statement that Mr. Suydam was physically and medically unable to make an extensive search for the missing book on his own on two grounds: first, that no admissible

11

41; PSAMF ¶¶ 10-11, 19, 26. He also told them that the A&D Book was "hiding" somewhere else. DSMF ¶ 41; PRDSMF ¶ 41. In August 2010, five months after the March 3rd inspection, Mr. Suydam hired a man to search for the A&D Book. DSMF ¶ 45; PRDSMF ¶ 45. The book was found in the second floor storage room after one day of searching. DSMF ¶ 46; PRDSMF ¶ 46.

### 6.    The 2010 License Revocation

On July 8, 2010, the ATF issued a Notice of Revocation of License to Licensee to Mr. Suydam via Certified Mail, but the letter was not signed for and was returned to the ATF undelivered. DSMF ¶¶ 50-51; PRDSMF ¶¶ 50-51. On July 20, 1010, the ATF issued a second Notice of Revocation of License to Licensee, which was hand-delivered to Mr. Suydam by IOI Gagne. DSMF ¶¶ 52-53; PRDSMF ¶¶ 52-53.

During the administrative hearing on Mr. Suydam's FFL revocation, Mr. Suydam testified that he understood that federal firearms regulations required him to maintain an A&D Book at all times, and that the purpose of maintaining such records was to be prepared to provide them to the ATF upon request. DSMF ¶¶ 47-48; PRDSMF ¶¶ 47-48. Mr. Suydam also testified that he knew it was his responsibility to maintain an A&D Book and to have it ready for inspection by the ATF:

---

evidence nor expert testimony has been admitted supporting Mr. Suydam's claim that he was medically unable to search for the book in his home, and second, that Mr. Suydam testified to the contrary at the administrative hearing. DRPSAMF ¶ 11. Specifically, the ATF points out that Mr. Suydam testified that searching for the book himself would be "not pleasant" but not impossible. DRPSAMF ¶ 11 (citing *Revocation Tr.* at 55). The Court accepts Mr. Suydam's statement for purposes of the pending motion.

Q: Did you understand the ATF rules and regulations that you were to maintain an A&D Book?

A: Of course.

Q: Okay. Did you understand that requirement to mean that you had to have that book ready to show them at a moment's notice if an inspector showed up?

A: That is what I . . . that's the purpose of having an A&D Book . . . .

DSMF ¶ 49; PRDSMF ¶ 49; DSMF Attach. 1 *Chabra Decl.* Ex. B (*Revocation Tr.*) at 61.

## C.    The Parties' Positions

### 1.    The ATF's Motion for Summary Judgment

The ATF argues that Mr. Suydam's petition for *de novo* review of its revocation of his federal firearms license must fail as a matter of law. *Def.'s Mot.* at 1. The ATF states that revocation of the license was authorized because the undisputed evidence at the license revocation hearing clearly showed that Mr. Suydam knew and understood the record-keeping requirements of the Gun Control Act and failed to comply with them. *Id.* at 1, 18. The ATF argues that Mr. Suydam repeatedly violated the record-keeping requirements of his FFL despite multiple explanations of those requirements and warnings that future non-compliance could result in the revocation of his license. *Id.* at 13-14. The ATF further maintains that Mr. Suydam's lack of effort to locate the records he knew to be misplaced within his own home for more than eight months demonstrates purposeful disregard of or plain indifference to the record-keeping requirements of federal firearms license

holders and establishes a willful violation authorizing the revocation of his license. *Id.* at 2; 14-16.

### 2. Mr. Suydam's Opposition

Mr. Suydam opposes the ATF's motion for summary judgment, arguing that the disappearance of his second A&D Book (containing transactions from 2002 through November 2009) is not grounds for license revocation because it was not a willful violation. *Pl.'s Opp'n* at 10-11. Mr. Suydam denies that he was plainly indifferent to or that he recklessly disregarded federal firearms regulations and, in fact, he "cared very deeply about his legal responsibilities," but was physically and medically unable to search for the misplaced record book on his own. *Id.* at 3-5, 10. He asserts that it would have taken "many hours, and perhaps even days or weeks, and a lot of physical effort to look through all of the stacks of books to find that one," and that he was unable to hire outside help whom he trusted until August of 2010. *Id.* at 4.

### 3. The ATF's Reply

In reply, the ATF reiterates that Mr. Suydam admits he knew and understood the record-keeping requirements of the GCA and federal firearms regulations and that he admits to violating those requirements after multiple ATF explanations and warnings about properly maintaining his firearm transaction records and having them available for ATF inspection. *Def.'s Reply* at 1. The ATF argues that Mr. Suydam's sole defense—that he suffers from various mental and physical impairments—has been unanimously rejected as a defense to willful

federal firearms violations. *Id.* at 1, 3-6. The ATF further contends that the evidence clearly shows that Mr. Suydam's inability to provide his 2002-2009 A&D Book to ATF agents at the March 3, 2009 inspection was not "inadvertent," but rather that "he knew he was required to locate his lost A&D Book, but for many months took functionally no steps to locate it and comply with federal law." *Id.* at 3.

## II.  LEGAL STANDARDS

### A.  Summary Judgment

"Notwithstanding the posture of this case as an appeal of an administrative decision, the summary judgment standard is the same as in any other civil action." *Gilbert v. Bangs*, No. 10-cv-1440-AW, 2011 U.S. Dist. LEXIS 93774, at *9 (D. Md. Aug. 22, 2011). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A fact is material where "its existence or nonexistence has the potential to change the outcome of the suit." *Tropigas de Puerto Rico, Inc. v. Certain Underwriters at Lloyd's of London.*, 637 F.3d 53, 56 (1st Cir. 2011) (citing *McCarthy v. Nw. Airlines, Inc.*, 56 F.3d 313, 315 (1st Cir. 1995)). An issue is genuine where "a reasonable jury could resolve the point in favor of the nonmoving party." *Tropigas*, 637 F.3d at 56 (quoting *McCarthy*, 56 F.3d at 315). In deciding a motion for summary judgment, the Court "views the facts and draws all reasonable inferences in favor of the nonmoving party," *Ophthalmic Surgeons, Ltd. v. Paychex, Inc.*, 632 F.3d 31, 35 (1st Cir. 2011), while "ignoring conclusory allegations, improbable inferences, and unsupported speculation," *Chiang v. Verizon*

*New England Inc.*, 595 F.3d 26, 30 (1st Cir. 2010) (quoting *Sutliffe v. Epping Sch. Dist.,* 584 F.3d 314, 325 (1st Cir.2009)).

The initial burden is on the moving party to show that there exists an absence of genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the moving party meets this initial burden, then the non-moving party must set forth specific facts showing that there is a genuine issue for trial in order to defeat the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

### B.     District Court Review of FFL Revocation

The standard for judicial review of an FFL revocation is found in 18 U.S.C. § 923(f)(3):

> The aggrieved party may at any time within sixty days after the date notice was given under this paragraph file a petition with the United States district court for the district in which he resides or has his principal place of business for a de novo judicial review of such denial or revocation. In a proceeding conducted under this subsection, the court may consider any evidence submitted by the parties to the proceeding whether or not such evidence was considered at the hearing held under paragraph (2). If the court decides that the Attorney General was not authorized to deny the application or to revoke the license, the court shall order the Attorney General to take such action as may be necessary to comply with the judgment of the court.

*Id.*

### C.     *De Novo* Review of Whether Revocation Was Authorized Based on Willful Violation

Because the First Circuit has not addressed the license revocation portions of the GCA and relevant regulations, the Court is guided by the text of the statute and regulations and by other circuit analysis of the issue. In general, although the law

provides for a *de novo* review, the statute makes it clear that the focus of that review is narrow: whether the Attorney General was "authorized" to revoke the license.  18 U.S.C. § 923(f)(3).

### 1. *De Novo* Review

"Under the *de novo* standard of review for a decision of the ATF, the district court may give the agency's finding and decision such weight as it believes they deserve, but need not accord any particular deference to those findings."  *Gilbert*, 2011 U.S. Dist. LEXIS 93774, at *8-9 (internal quotation marks omitted); *see also Stein's, Inc. v. Blumenthal*, 649 F.2d 463, 467 (7th Cir. 1980); *Article II Gun Shop, Inc. v. Ashcroft*, No. 03-C-4598, 2005 U.S. Dist. LEXIS 18873, at *9 (N.D. Ill.  Mar. 25, 2005).  In other words, the decision under review "is not necessarily clothed with any presumption of correctness or other advantage."  *Stein's*, 649 F.3d at 466-67.  A court "can receive and consider evidence in addition to that submitted in the administrative proceeding," *Gilbert*, 2011 U.S. Dist. LEXIS 93774, at *9, "when some good reason to do so either appears in the administrative record or is presented by the party petitioning for judicial review." *Shawano Gun & Loan, LLC v. Hughes*, 650 F.3d 1070, 1076 (7th Cir. 2011) (quoting *Stein's*, 649 F.3d at 466).  At the same time, a district court may rule without holding an evidentiary hearing. *Cucchiara v. Sec'y of Treasury*, 652 F.2d 28, 30 (9th Cir. 1981).

### 2. Authorized

By confining a court's inquiry to whether the Attorney General's decision was "authorized," § 923(f)(3) "does not call upon this Court to decide whether it would

revoke the license in its own judgment, but whether all of the evidence presented is sufficient to justify the Attorney General's revocation of the license." *Morgan v. U.S. Dep't of Justice*, 473 F. Supp. 2d 756, 762 (E.D. Mich. 2007) (quoting *Pinion Enters., Inc. v. Ashcroft*, 371 F. Supp. 2d 1311, 1315 (N.D. Ala. 2005)); *see also Procaccio v. Lambert*, No. 5:05-MC-0083, 2006 U.S. Dist. LEXIS 50748, at *6-7 (N.D. Ohio Jul. 25, 2006) ("the Court considers whether the Attorney General's revocation was authorized, not whether this Court would make the same decision if originally presented with the issue"); *Armalite, Inc. v. Lambert*, 544 F.3d 644, 650 (6th Cir. 2008); *Article II Gun Shop, Inc. v. Gonzalez*, 441 F.3d 492, 494 (7th Cir. 2006); *Perri v. Dep't of Treasury*, 637 F.2d 1332, 1335 (9th Cir. 1981); *Lewin v. Blumenthal*, 590 F.2d 268, 269 (8th Cir. 1979); *Prino v. Simon*, 606 F.2d 449, 450 (4th Cir. 1979).

### 3. Willful

The ATF is authorized to "revoke any license issued under [the GCA] if the holder of such license has willfully violated" any provision of the GCA or related regulations. 18 U.S.C. § 923(e). "Willful," in this context, does not require a showing that the violation was intentional or purposeful, but merely that the violation was made with reckless disregard of or plain indifference toward the regulations.[14] *See, e.g., Athens Pawn Shop Inc. v. Bennett*, 364 Fed. Appx. 58, 59 (5th Cir. 2010) ("[t]o prove that a firearms dealer 'willfully' violated the law, ATF

---

[14] The § 923(f)(3) use of "willfully" is much less stringent than in criminal law. In criminal law, "willfully" is "a voluntary, intentional violation of a known legal duty." *United States v. Griffin*, 524 F.3d 71, 77 (1st Cir. 2008). "Willfully" in § 923(f)(3) extends to reckless and plainly indifferent violations. *Athens Pawn Shop Inc. v. Bennett*, 364 Fed. Appx. 58, 59 (5th Cir. 2010).

must show that the dealer either intentionally and knowingly violated its obligations or was recklessly or plainly indifferent despite the dealer's awareness of the law's requirements"); *Gen. Store, Inc. v. Van Loan*, 560 F.3d 920, 924 (9th Cir. 2009) (holding that "a deliberate, knowing, or reckless violation" of the GCA's requirements constitutes a willful violation); *Armalite*, 544 F.3d at 648 ("[a] dealer 'willfully' violates the GCA when it intentionally, knowingly or recklessly violates known legal requirements"); *Lewin*, 590 F.2d at 269 (holding that "plain indifference to the regulatory requirements" satisfies willfulness requirement of § 923). A showing of "bad purpose" or malicious intent is not required. *See Article II Gun Shop, Inc. v. Gonzalez*, 441 F.3d at 497; *Lewin*, 590 F.2d at 269. Furthermore, a single violation may justify revocation. *See Armalite*, 544 F.3d at 649; *Am. Arms Int'l v. Herbert*, 563 F.3d 78, 86 (4th Cir. 2009).

In the words of the Fourth Circuit, proving willfulness in the context of a failure to act often requires a court to "infer willful omission" where there exists evidence that the party either "knew of the requirement" or "knew generally that his failure to act would be unlawful." *RSM, Inc. v. Herbert*, 466 F.3d 316, 322 (4th Cir. 2006). Generally, a "willful" violation exists where a dealer is repeatedly cited for the same or similar violations and warned that any future violations "would be considered willful and could jeopardize its license." *Athens Pawn Shop*, 364 Fed. Appx. at 60; *see also Article II Gun Shop, Inc. v. Gonzalez*, 441 F.3d at 498 (citing *Stein's*, 649 F.2d at 468 ("Evidence of repeated violations with knowledge of the law's requirements has been held to be sufficient to establish willfulness")). After-

19

the-fact attempts to correct specific violations "are irrelevant to the issue of willfulness at the time the errors occurred." *Sturdy v. Bentsen*, 129 F.3d 122, at *2 (8th Cir. 1997) (unpublished table decision). To prevail, the Government must demonstrate that "a dealer understands the requirements of the law, but knowingly fails to follow them or was indifferent to them." *Perri*, 637 F.2d at 1336; *see also Am. Arms Int'l*, 563 F.3d at 87 (affirming summary judgment for ATF where defendant "displayed a lack of concern for the regulations that clearly meets the standard of willfulness").

### 4.     Physical or Mental Illness as an Excuse

In general, physical illness does not excuse a licensee from complying with federal record-keeping regulations. *See, e.g., Vineland Fireworks Co., Inc. v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 544 F.3d 509, 522 (3rd Cir. 2008) (affirming finding of willfulness, applying GCA's willfulness standard to explosives case, despite bookkeeper's illness where explosives licensee's failure to properly record transactions "was not a 'one-off event,'" "but instead extended for months" during bookkeeper's absence for cancer treatments).

Nor do mental defects, such as attention deficit disorder, necessarily excuse or overcome a finding of willfulness. *See Sturdy*, 129 F.3d 122, at *1-2 (rejecting licensee's claim of attention deficit disorder and finding willful violation where licensee had been cited for similar violations in previous inspections and received descriptions of the violations and warnings that future violations would result in license revocation). As the Eastern District of Missouri recently noted, when

rejecting a federal firearms licensee's claim that her mental incapacity negated willfulness, "policy reasons weigh against having the court read into the statute a dispensation for firearms dealers who, because of their *own* diminished capacity, might sell guns to unqualified individuals." *Gun Shop LLC v. U.S. Dep't of Justice*, No. 4:10CV01459MLM, 2011 U.S. Dist. LEXIS 59586, at *30 n.9 (E.D. Mo. Jun. 3, 2011) (emphasis in original).

## C. *De Novo* Review in the Summary Judgment Context

There is a certain tension between the Court's obligation under the statute to perform a *de novo* review to determine whether the ATF decision was "authorized" and the Court's corresponding obligation under Rule 56 to view the facts in the light most favorable to the non-movant. *Compare* 18 U.S.C. § 923(f)(3), *with* Fed. R. Civ. P. 56. Merely by presenting conflicting facts, each licensee could effectively block the summary disposition of his case and demand a full evidentiary hearing, a result that would run contrary to the statutory directive of a *de novo* review only on whether the ATF decision was authorized. *Willingham Sports, Inc. v. Bureau of Alcohol, Tobacco, Firearms and Explosives*, 348 F. Supp. 2d 1299, 1306 (S.D. Ala. 2004) ("that the [GCA] provides for *de novo* review of administrative decisions is not to vest a firearms dealer with an absolute right to an evidentiary hearing in appealing from an adverse ATF decision"). Noting that § 923(f)(3) permits the district court to enter judgment on the basis of the administrative record when no substantial reason to receive additional evidence is present, the courts have developed a practice "to grant judgment summarily when the material facts

developed at the administrative hearing, which the court also concludes justify nonrenewal are not substantially drawn into question by the party petitioning for review." *Stein's*, 649 F.2d at 468 n.7 (quoting *Mayesh v. Schultz*, 58 F.R.D. 537, 539 (S.D. Ill. 1973)) (internal quotation marks omitted). Thus, "the Secretary's decision may be upheld when the trial court concludes in its own judgment that the evidence supporting the decision is substantial." *Stein's*, 649 F.2d at 467 (internal quotation marks omitted); *see also Arwady Hand Trucks Sales, Inc. v. Vander Werf*, 507 F. Supp. 2d 754, 758 (S.D. Tex. 2007); *Harrison v. Dep't of the Treasury*, No. CIV-04-100-SPS, 2006 U.S. Dist. LEXIS 82348, at *2-3 (E.D. Okla. Nov. 9, 2006).

## III. DISCUSSION

Under the GCA and its regulations, federally licensed firearms dealers are required to keep detailed records, including a record of all acquisitions and dispositions, and to make these A&D Books available for inspection at the ATF's request. 27 C.F.R. §§ 121(b), 478.121(b). Thus, for the revocation to have been authorized and for the Court to grant summary judgment in favor of the ATF, the undisputed facts must demonstrate: 1) that Mr. Suydam was aware of the record-keeping requirements imposed on him by federal firearms regulations and 2) that he intentionally or knowingly failed to comply with or recklessly disregarded or was plainly indifferent to his obligation to keep detailed records of all firearm acquisitions and dispositions and be able to provide that information to the ATF upon request. *See, e.g., Athens Pawn Shop*, 364 Fed. Appx. at 59.

Here, the record, even when viewed most favorably to Mr. Suydam, does not raise a genuine issue of material fact. There is no factual dispute on the first factor—Mr. Suydam's awareness of the need to maintain records and to produce those records to the ATF.[15] Mr. Suydam admits that he was unable to produce an A&D Book for the period of 1989 to 2002 at the September 2008 inspection, that the ATF warned him about his failure to provide the requested information at that time, that he understood the record-keeping requirements of his FFL, and that he was again unable to produce an A&D Book for the period from 2002 to late November of 2009 upon inspection in March of 2010. Moreover, Mr. Suydam admits that he was explicitly warned, after his failure to provide an A&D Book for a period of over ten years at the September 2008 inspection, that future violations could be deemed willful. DSMF ¶¶ 23-24; PRDSMF ¶¶ 23-34. Finally, after losing the A&D Book even after the agent's advice about starting a new book, Mr. Suydam acknowledged that he remained very concerned and he knew he had to find the book as soon as possible. PSAMF ¶ 1; DRPSAMF ¶ 1. The Court readily concludes there is no genuine issue of material fact as to whether he was aware of both the record-keeping regulation and the requirement that he produce those records to the ATF upon inspection.

The Court turns to whether there is a genuine issue of material fact about whether he knowingly failed to keep the appropriate records or was plainly indifferent to his obligations. Even if Mr. Suydam did not intend to keep his 2002-

---

[15] At oral argument, counsel for the Plaintiff conceded that Mr. Suydam was fully aware of his record-keeping obligations as a result of his previous warnings from the ATF.

2009 A&D Book from the ATF, his repeated failure to provide that information at the ATF's request satisfies the legal standard for a "willful" violation because he "knew generally" that his failure to locate and present the missing 2002-2009 A&D Book (either on his own or with hired help) would violate the requirements of his FFL. *See RSM*, 466 F.3d at 322 (inferring willful omission from evidence that licensee "knew generally that his failure to act would be unlawful"); *see also Athens Pawn Shop*, 364 Fed. Appx. at 60 (finding willful violation where dealer was repeatedly cited for similar violations and warned that any future violations "could jeopardize its license").

The undisputed facts support the conclusion that Mr. Suydam was plainly indifferent to the record-keeping requirements of his FFL. A conscientious licensee would not have misplaced the A&D Book in the first place. In September 2008, the ATF warned Mr. Suydam about the imperative to maintain the A&D Book, and it was the very next fall that he hired others to move his books. Yet on moving day, Mr. Suydam failed to adequately sequester this essential, federally-mandated record book from the rest of his extensive library. Allowing the intermingling of the A&D Book with the other books in his voluminous collection is evidence of reckless disregard or plain indifference to his legal obligations as the holder of an FFL to maintain and make available the mandated records.

After losing an A&D Book, a federal firearms licensee who was not indifferent to his record-keeping obligations would make every effort to find the book. Mr. Suydam had more than three months from late November of 2009 when

he noticed the 2002-2009 A&D Book was misplaced, until the ATF's March 3, 2010 inspection to locate—or arrange for assistance in locating—the book in his home and make it available should the ATF request to inspect his records. Other than one "cursory" visual search of the storage room around the time the book went missing in late November of 2009, Mr. Suydam did not look further and did not hire anyone to look for it until August of 2010, *after* receiving notice of the revocation of his FFL on July 20, 2010. *Chabra Decl.* Ex. C-3 *Notice of Revocation*; DSMF ¶ 45; PRDSMF ¶ 45. Although he asserts that he did not leave his house much between November of 2009 and the March 3, 2010 inspection, the record is silent as to why it took until August—and only after he received notice of his license revocation—for Mr. Suydam to arrange for assistance in searching the storage room for the book. Nine months elapsed with nothing but one "cursory search" for the missing A&D Book. Even if Mr. Suydam's physical and mental conditions prohibited him from conducting more than a brief cursory search at any given time, there is no evidence that he searched the room more than once. A cursory search, if systematically repeated daily or even weekly, becomes more than cursory over time; however, the evidence both at the revocation hearing and before the Court confirms that Mr. Suydam limited his search for the missing A&D Book to that one "cursory search" conducted around the time the book went missing in November of 2009.

Even viewing the evidence in the light most favorable to Mr. Suydam, the undisputed facts make clear that he plainly knew, as the holder of a federal license to buy and sell firearms, that the license came with an obligation to maintain and

present for inspection all records of his firearm acquisitions and dispositions and that he twice failed to have his A&D Books available for inspection. After one failed inspection, a Report of Violations, a warning conference, and multiple discussions with ATF agents about his record-keeping obligations, another of Mr. Suydam's A&D Books went missing and he failed to take immediate action to rectify the situation.

Mr. Suydam's most earnest contention is that his physical and mental conditions effectively deflect the statute's willfulness requirement. His argument is that physical and mental inability is not volitional and therefore not willful. Even assuming that in a highly unusual case, a temporary and severe physical or mental condition could effectively blunt the willfulness requirement, this is not that case. Mr. Suydam's physical and mental conditions were not so severe that they justified his prolonged failure to find or make arrangement to find the mandatory records. Although the Court is sympathetic to Mr. Suydam's physical and mental conditions, those conditions do not excuse him from maintaining proper records and having them available for inspection. *See, e.g., Vineland Fireworks Co.*, 544 F.3d at 522; *Sturdy*, 129 F.3d 122, at *1-2.

Here, the facts belie the defense. After nine months of lost records, Mr. Suydam finally galvanized himself and hired someone to perform a more systematic and serious search of his storage room. The A&D Book was discovered within a day. Mr. Suydam has not been able to satisfactorily explain why what was easily found—nine months after it went missing—could not have been found immediately,

if only he or someone on his behalf had looked for it. The ATF is not required to wait for months as its licensees delay production of mandatory records.

The public safety concerns behind imposing such requirements on federal firearms licensees are obvious, and need not be expounded here. *See, e.g., Huddleston v. United States*, 415 U.S. 814, 824 (1974) (noting importance of GCA's record-keeping requirements for firearms dealers because "[t]he principal agent of federal enforcement is the dealer"); *Am. Arms Int'l*, 563 F.3d at 79 n.1 ("[p]roper records maintenance is crucial to law enforcement, which uses the information contained in these records to trace firearms involved in crimes"). Especially concerning is the fact that the two missing A&D Books represent a full twenty years of firearm acquisition and disposition records that Mr. Suydam was required to maintain and produce and yet was unable to provide to the ATF for inspection. The Court concludes that there is no genuine issue of material fact as to whether the ATF was authorized to revoke Mr. Suydam's FFL based on his willful violation of the provisions of the GCA and related federal firearms regulations.

## IV. CONCLUSION

The Court GRANTS the ATF's Motion for Summary Judgment (Docket # 9).

SO ORDERED.


/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
CHIEF UNITED STATES DISTRICT JUDGE


Dated this 22nd day of February, 2012